SAMUEL SANFORD *vs.* MECHANICS' MUTUAL FIRE INSURANCE COMPANY.

The person intended by the term " the insured " or " the assured," in a mutual fire insurance policy, is the person who owns the property, applies for the insurance, pays the premium, and signs the deposit note, and not another person to whom the money is payable in case of loss, although he may have a lease of the premises.

E., having leased certain premises to S., with permission to erect other buildings, and to under-let, effected an insurance on the property, payable, in case of loss, to said S. The latter under-let a portion of the premises to M., who, contrary to his lease not to " make or suffer any alteration, or make or suffer any waste therein," erected furnaces for manufacturing purposes, which increased the risk, but without the knowledge or consent of E. or of S. *Held,* that the policy was not void as violating a by-law which prohibited " the insured " from altering the building without the consent of the company, nor a by-law which made the policy void whenever the risk was increased by the act of " the assured ; " and that S. could recover the whole amount of the loss insured.

THIS was an action on a policy of insurance for $4,000, against loss by fire, on a building in Atkinson street, Boston. At the trial in this court, before *Bigelow,* J., March term, 1852, it was proved or admitted that on the 26th of October, 1844, the heirs of John Fleet leased the premises to the plaintiff for the term of ten years, at $700 per annum, with a provision " that said lessee has permission to make such alterations as he may deem proper; to take down the house, provided the buildings erected in its stead shall be of equal value, and also to under-let the premises, if he shall see fit. And it is mutually understood and agreed that all buildings and improvements, made and erected by the said lessee on the said premises, shall be left and remain thereon, for the benefit of said lessors, without any compensation to said lessee." Said lease was subsequently assigned to William H. Sanford and Sidney B. Morse, the latter of whom, on the 9th of June, 1845, released all his interest to said William H., and on the 1st of August, 1845, the defendant company issued the policy in question, upon the written application of " John F. Eliot, for the heirs of John Fleet," (Eliot being one,) payable in case of loss to said William H. Sanford. By the terms of the policy, Eliot

was made a member of the company, and he paid the pre-mium and gave his deposit note. On or about the 20th of January, 1847, said William H. reassigned said lease to the plaintiff, and also, with the assent of the company, assigned to him all his right and interest in the policy. The plaintifl also proved that the building destroyed was erected by him self, or those under whom he claimed, in pursuance of said lease, and that the same was wholly destroyed by fire on the 24th of June, 1851.

On the part of the company, it was proved that on the 1st of March, 1851, the plaintiff, under the permission in his lease, underlet two stores in said building to the firm of Moore, Collins & Co., [the nature of which lease is sufficiently stated in the opinion of the court:] That said firm appropriated a part of said building to the sale of an article called washing fluid, and one room to the manufacture of said fluid ; that said fluid was a strong alkaline solution, was not explosive, and was much more effectual than water in putting out fire; that said firm of Moore, Collins & Co., in order to manufac-ture said fluid, caused to be placed and set in said room, four furnaces, or farmers' kettles, for the purpose of heating water, in order to dissolve said alkali; that said kettles were set on brick hearths or foundations, and that every care was taken to prevent fire from escaping; and that in their opinion no fire could escape from said furnaces ; that the smoke from said furnaces was carried by a funnel into an aperture left in the chimney at the time the building was erected, there being no fireplace in that room : that when in full operation, said firm manufactured one thousand gallons of fluid per day, although for that purpose it was necessary to heat the entire quantity cf water ; that the setting of said furnaces and kettles, and the appropriation of said buildings to the manufacture and sale thereof was done by said Moore, Collins & Co., and not by the plaintiff, or with his assent; that they never saw the plaintiff at the buildings after they leased the same, and that the plaintiff did not, to their knowledge, know that said fluid was manufactured or sold at said premises; that the process of making said fluid was kept secret; that the room where

said kettles were set, and said fluid made, was kept locked, and no one was admitted therein except the members of said firm, and that said fluid was made exclusively by one of said firm ; that the plaintiff never was in the said room, nor did he, to their knowledge, know the use made of it. Said Collins further testified, that for three days before said build-ing was burned, there had been no fire in said room, and that during all that time said room had been kept locked, and he, said Collins, had the key of the same. It also appeared that the fire originated in a part of the building remote from the premises of Moore, Collins & Co., and that their rooms were the last destroyed.

The defendants also proved that there was on the front of said building, a sign with the words " North American Elec-tric Washing Fluid ;" also a sign with the name of the firm. The secretary of the defendant corporation testified, that after the fire, Sanford, the plaintiff, was at the office, and that the president said to him, " The first I knew of the building being occupied for manufacturing purposes was, seeing the boilers tumbling out among the ruins." Sanford replied, " It was your business to know it, — there were the signs up there, and you might have known it."

The defendants called John F. Eliot, the party named in the policy, and he testified, that from something he had heard, he was led to go to the buildings where said fluid was sold, and taste the same; that he went into the lower story, and found it to be a strong alkaline solution, and came out; that he did not go up stairs; that he did not ask to go up, and was not refused permission to go up; that he passed the building five or six times every day; that he knew the article was kept there for sale, but that he did not by the sign or otherwise, know that the article was manufactured in that building, or that the kettles or furnaces were set there; that he remembered no sign, except that of the names of the firm.

The defendants offered to prove by said Eliot, that although he was named in the aforesaid policy of insurance, he was made a party because he was one of the owners of the land on which the buildings insured stood; and also that the insur

ance was applied for, in the first instance, by the plaintiff, and was really effected for his benefit, but was effected in the manner before stated in order to comply with a rule of the company requiring the premium or deposit note to be signed by the owner of the land. The court being of the opinion that the construction of the policy, and the rights of parties under it, must depend upon the terms of the policy and the by-laws of the company, rejected this evidence; but if it is competent, in the opinion of the whole court, it is to be considered and weighed in the decision of the questions of law raised by this report.

At this stage of the trial, in answer to an inquiry by the presiding judge, the defendants stated, that they had no other or further evidence than that above stated, to prove knowledge or assent by said Eliot or said Sanford to the erection of said kettles and furnaces in said building, and the manufacture of said fluid therein. Thereupon, the presiding judge stated that two questions of law arose upon this state of the evidence.

1st. It appearing by the testimony of said Eliot, that he neither knew or assented to the erection and use of said kettles and furnaces in said building, or the manufacture therein of said fluid, whether such erection and use, if material to the risk, would, by the true construction of the policy and by-laws, avoid the policy?

2d. Whether a knowledge of and assent to such erection and use of the building, if material to the risk, by said Sanford, the plaintiff, to whom the policy was payable in case of loss, would avoid the policy?

And the court, being inclined to the opinion, that the defendants could not sustain their defence upon either of these grounds, took the case from the jury, and reserved these questions for the whole court. It was agreed between the parties that if the whole court should be of opinion, that a knowledge of and assent by said Eliot to said erections, use, and alterations, if material to the risk, were necessary to be proved in order to avoid the policy, and that such alterations, erections, and use, if made by tenants without the knowledge or

assent of said Eliot, though material to the risk, would not avoid the policy, the defendants should be defaulted, and judgment rendered for the amount insured by the policy.

If the court should be of opinion that such knowledge and assent by said Sanford were sufficient to avoid the policy, and that the evidence above reported on this point is sufficient to warrant a jury in finding such knowledge and assent, by said Sanford, then the case is to be sent to a jury to be tried. But if such knowledge and assent, by said Sanford, are immaterial, and would not avoid the policy, or if the evidence, as above stated, is insufficient to warrant a jury in finding such assent and knowledge, the defendants are to be defaulted, and judgment is to be rendered for the amount insured by the policy.

The two by-laws, upon which the defendants relied, were as follows: Art. 16. When the insured shall alter or enlarge a building, or appropriate the same to any other purposes than those mentioned in the policy without the consent of the president first obtained, the said policy shall become void. But in case the assured shall, within sixty days after such alteration, enlargement, or different appropriation, give notice thereof to the secretary, the president may revive the policy upon such terms as he may deem equitable; but if not revived, the assured shall be entitled to such return of premium and deposits as is provided in article 23d.

Art. 19. Whenever the risk of any insurance is increased by the act of the assured, the policy shall thereupon be void, unless the assured shall have previously notified the president of such act, and obtained his consent therefor.

*C. W. Loring & G. W. Phillips,* for the defendants. 1. Admitting that John F. Eliot and his associates were the assured, the acts of the tenants, Moore, Collins & Co., were his and their acts, within the meaning of the policy, whether actually known to them or not. By-Laws, Art. 16, 19; *Grant* v. *Howard Ins. Co.* 5 Hill, 10; *Boatwright* v. *Ætna Ins. Co.* 1 Strob. 281; *Stetson* v. *Massachusetts Mutual Fire Ins. Co.* 4 Mass. 330, 340; *Catlin* v. *Springfield Fire Ins. Co.* 1 Sumn. 435, 456; *Guille* v. *Swan,* 19 Johns. 383; *Wheeler* v. *Earle,* 5

46 *

Cush. 32; *Pipon* v. *Cope*, 1 Camp. 434. Paley on Agency 295, and note : Statement of rule there as laid down in *Sleath* v. *Wilson*, 9 C. & P. 607, and in *Wanstall* v. *Pooley*, 6 Clarke & Finnelly, 910, note; 1 Phil. on Ins. §§ 763, 983, 984, 1001, 1031.

2. That the restrictions imposed by Sanford's lease, upon Moore, Collins & Co., cannot qualify these acts, as they are to affect Eliot and his associates. Taylor's Land. and Ten. § 109.

3. That by the terms of the policy, and by virtue of the assignment thereof, and from the relation of all the parties named therein, Sanford, the plaintiff, was " the assured." *Tillou* v. *Kingston Mut. Ins. Co.* 7 Barb. 571; S. C. 1 Seld. 405 ; 1 Phil. on Ins. § 868.

4. That the evidence of Eliot relating to his connection with the insurance, should have been admitted. 1 Greenl. Ev. §§ 282, 283 ; *Finney* v. *Bedford Commercial Ins. Co.* 8 Met. 348 ; *Mellish* v. *Bell*, 15 East, 4 ; *Barrett* v. *Union Mut. Fire Ins. Co.* 7 Cush. 180.

5. If Sanford was the assured, the case should have been suffered to go to the jury.

*R. Choate & A. H. Fiske*, for the plaintiff. 1. That by the words " insured " and " assured," in the 16th and 19th articles of the defendants' by-laws, John F. Eliot is intended, and he alone. This is made certain by all the by-laws, and by Rev. Sts. *c.* 37, §§ 24 to 39, inclusive.

2. The case finds that John F. Eliot made no appropriation of the insured premises, to any other use than that which is specified in the policy, nor has he done anything whereby the risk has been increased, nor has such appropriation or increase of risk been with his knowledge. The by-laws impose onerous duties on the insured, and are not to be extended by implication. *Catlin* v. *Springfield Fire Ins. Co.* 1 Sumn. 440. And on the common rule of interpretation, the language is to be construed strongest against the speaker. *Drinkwater* v. *Corporation of London Assurance*, 2 Wils. 363; *Blackett* v. *Royal Exch. Assurance Co.* 2 Cromp. & Jer. 244.

3. The acts of Moore, Collins & Co. are not the acts of

Eliot. They are not his tenants. They had an estate in the premises, which he could not control, and over which he had no power. And if they were his tenants, they were not his agents. The acts of the tenant are not the acts of the land-lord. The landlord has no right to interfere with the tenant, so long as he keeps his covenants. The tenant has a separate insurable interest. And it is not uncommon for him to insure his interest, as was done in *Wright* v. *Pole*, 1 Ad. & Ell. 621; *Laurent* v. *Chatham Fire Ins. Co.* 1 Hall, 41. So far from being the agent of the landlord, he is liable at common law to the landlord for permissive waste, in case the demised prem-ises are consumed by fire, occasioned by his negligence. 4 Kent Com. 81. It cannot be pretended if a building is inten-tionally destroyed by a tenant, that the landlord cannot recover. The great object of insurance is to guard against the negligence and fraud of others. And it is well settled that a policy covers losses occasioned by the negligence of the insured or his servants. *Patapsco Ins. Co.* v. *Coulter*, 3 Pet. 222; *Columbia Ins. Co.* v. *Lawrence*, 10 Pet. 517, 518; *Austin* v. *Drew*, 4 Camp. 360; *Shaw* v. *Robberds*, 1 Nev. & Per. 279; *Waters* v. *Merchants' Louisville Ins. Co.* 11 Pet. 220; *Lyon* v. *Commercial Ins. Co.* 2 Rob. (La.) 266; 2 Arn. on Ins. 837; 1 Phil. on Ins. 622. The defendants, in their policy and by-laws, make a clear distinction between acts of the assured and acts of others.

4. The evidence offered by the defendants, as to the reason why the policy was made in the name of Eliot, was properly rejected. It was an attempt to show a contract with a differ-ent party. 1 Greenl. Ev. § 315; *Miller* v. *Travers*, 8 Bing. 244; *Finney* v. *Bedford Commercial Ins. Co.* 8 Met. 348; *Bryant* v. *Ocean Ins. Co.* 22 Pick. 200; *Parks* v. *General Interest Ins. Co.* 5 Pick. 34; *Ewer* v. *Washington Ins. Co.* 16 Pick. 502; *Alston* v. *Mechanics' Mut. Ins. Co.* 4 Hill, 329; *New York Ins. Co.* v. *Thomas*, 3 Johns. Cas. 1; *Higginson* v. *Dall*, 13 Mass. 96; *Dow* v. *Whetten*, 8 Wend. 160; *Cheriot* v. *Barker*, 2 Johns. 346; *Jennings* v. *Chenango County Mut. Ins. Co.* 2 Denio, 75; 1 Duer on Ins. § 16; *Barrett* v. *Union Mut Fire Ins. Co.* 7 Cush. 175.

5. That if the facts offered to be proved were in evidence, the position of the parties would not be changed. This evidence would, in fact, confirm the position that Eliot was the assured, and the very form was used to make him such. Certainly these facts could not make Samuel Sanford, the plaintiff, the insured. Wm. H. Sanford, and not Samuel, is named in the policy. Samuel, the plaintiff, as the case shows, had, when the policy was made, no insurable interest.

6. If upon any construction of the by-laws and policy, and the evidence offered, Samuel Sanford can be deemed the insured, it will not vary the case; no act of his is proved, and he is not liable for the acts of his tenants. He guarded against the tenants making any alterations, by the lease he gave. Their acts are in direct violation of their covenants.

7. The plaintiff had no knowledge of, and did not assent to their acts. And the testimony on this subject is not sufficient to sustain a verdict affirming such knowledge or assent. The testimony on the part of the plaintiff is clear and conclusive on this matter. That of the secretary is too loose and inconclusive, especially as the burden of proof is on the defendants, to prove the fact.

8. If the proof would be sufficient to sustain a verdict finding knowledge in the plaintiff, it certainly fails in proving any assent on his part. And this is necessary. *Merriam* v. *Middlesex Mut. Fire Ins. Co.* 21 Pick. 162.

SHAW, C. J. 1. The first material question in the present case is, who, under this contract, is to be deemed the "insured" or the "assured," for both of these terms are used in the by-laws, though they no doubt mean the same person or class of persons; and the court are of opinion, that it is John F. Eliot, and the other persons designated by the description, "heirs of John Fleet." The property at risk was theirs, the insurable interest was in them; whereas the right and interest of Wm. H. Sanford, and of his assignee, Samuel Sanford, were derivative and subordinate. The money, it is true, was payable to Sanford, in case of loss, but that did not make him the assured. He was not a member of the Mechanics' Mutual Fire Insurance Company; he could not vote, could

not surrender the policy, or annul the contract. The legal relation of a party to whom, by the terms of the policy, the money is to be paid in case of loss, is most like that of the assignee of a chose in action, after notice of such assignment to the debtor, and a promise by him to the assignee to pay him. Such an assignee, or such a promisee, may maintain an action in his own name for the money when due.

2. Supposing, as we must suppose for the purpose of this action, that the acts done by Moore and others, the lessees of Samuel Sanford, by setting up works requiring fires, which increased the risk, would have rendered the policy void under the policy and by-laws, if done by the assured, does that avoid the policy, if done by a sub-lessee, without the consent or knowledge of the assured?

This is a question of great importance, and one upon which very little, in the way of authority, can be found. In order the better to understand the relations of the parties to each other, and the rights and duties flowing from them, it is necessary to examine the leases referred to with some care.

It appears that in 1844, the heirs of John Fleet, by a lease by them severally signed, demised the estate in Atkinson street to Samuel Sanford. All the circumstances tend to show, that the estate was then out of repair, and one of the objects of the lease to Sanford was, to replace the old buildings with new ones, and to let the estate to a capitalist, at such a reduction of rent and for such a term of years, as to reimburse him for the costs of the buildings to be erected by him; the object of the owners and reversioners being, to have their estate at the end of the term, with improved buildings upon it, without other cost to them. Such a lease would naturally call for powers to the lessee, to pull down and alter buildings, and to deal with the estate in a manner which would amount to waste by a tenant, if not done under agreement with the owners. This lease was soon after assigned by Samuel Sanford to Wm. H. Sanford and S. B. Morse; afterwards Morse assigned his moiety to Wm. H. Sanford, so that Wm. H. Sanford was sole assignee, and holder of the lease when the policy was made by the defendants in August, 1845.

At that time the alterations in the buildings contemplated to be made at the execution of the lease in 1844, had been made, either by Samuel Sanford, or his assignees; and in fact, it seems to have been the purpose of the heirs of Fleet, acting by John F. Eliot, one of them, to cause to be insured their interest in the buildings, thus newly erected on their land, in pursuance of their contract with Sanford. As to the authority of John F. Eliot to act for all the heirs of Fleet, it is not called in question here; we are to presume that the defendant company were satisfied. The names of these heirs are enumerated in the lease to Sanford, which was existing and on record when the policy was made, and by which they could be ascertained.

3. We are then brought to consider, what were the grounds of defence, relied upon by the company to exonerate them from payment of the loss. They are substantially, that before the fire took place, the premises were leased by Samuel Sanford, who had then again become the assignee of the original lease, to Messrs. Collins, Moore & Co.; that said firm appropriated a part of said buildings to the sale of an article called "washing fluid," and one room to the manufacture of said fluid, in which four kettles were set for the purpose. We are to assume, that this appropriation did increase the risk; for though the evidence might leave it doubtful, it was not left to the jury, but was assumed, for the purpose of raising the questions of law reserved. This question is to be considered on the evidence hereafter, if found necessary.

The defendants contended that this establishment of a hazardous manufactory rendered the policy void upon two grounds.

1st. Under the 16th by-law, it was an appropriation by the assured, or those for whose acts they were responsible, to purposes other than those mentioned in the policy, without the consent of the president of the company.

2d. Under the 19th by-law, because the risk was increased by the act of the assured.

It is contended that this must be considered as done by John F. Eliot and his associates, the assured, because, prior

to the insurance, they had given a lease which was then outstanding, with very large and unlimited powers to make any and all alterations, and that the act in question was done by tenants claiming under that lease.

The first inquiry upon this point is, whether the acts complained of were done, in pursuance of any of these extraordinary powers, or in other words, whether any such extraordinary powers were conferred on Moore, Collins & Co., the sub-lessees. It appears, then, that after this policy was made the lease was reassigned to Samuel Sanford, the original lessee, and he made the lease to Moore, Collins & Co. This lease conferred on the sub-lessees no extraordinary powers. It was in common form, a demise of the premises for three years and over, being the residue of his own term within one day. It was at a rent of $1,300, with usual covenants to keep a quiet and orderly place, not to make or suffer any waste thereof, nor lease, nor under-let, nor permit any other person or persons to occupy or improve the same, or make or suffer any alteration therein, &c., with clauses of reëntry, &c.

This was a demise under all the usual restrictions and limitations, and it is quite immaterial what Sanford's own powers were, to make alterations, if he did not transfer them, but, on the contrary, prohibited them, to the actual occupants, who are alleged to have done the acts, causing a forfeiture of the insurance.

It may be proper to state here, that Samuel Sanford stands, or has heretofore stood, in two relations to this transaction, in both of which, it is contended, the assured are bound or affected by his acts or knowledge. It is maintained, that he was the " assured " under the policy, and also assignee of the lease. If he was the assured of the policy, then he is affected by the express terms of the by-laws, that if the alterations, &c., are made by the " assured," that shall avoid the policy.

We have already stated the grounds, on which we think that Eliot and his associates were the " assured," and the same considerations lead to the conclusion that Sanford, who was to receive the money in case of loss, was not the assured. But we do not consider it necessary to decide that question.

because we can see no evidence of any express assent on his part, to the acts done by the lessees, and upon the only evidence reported, we are of opinion that there is no sufficient proof to warrant a jury in finding that Sanford knew of the establishment of the obnoxious manufacture on the premises, until after the fire. After the fire it was matter of notoriety from the disclosure of kettles and boilers, which were the subject of the very equivocal conversation alluded to. If he gave no express assent, and *à fortiori*, if he had no knowledge till after the fire, there were no facts to affect him as the "assured," except the acts done by tenants claiming under him; but this is equally true of Eliot and others, the owners. The tenants by whom the acts were done, were persons claiming, though a little more remotely, under the same lease, and, therefore, if those acts are to be deemed acts, for which the lessor is responsible, or by which his rights as assured could be affected, this consideration would apply as well to Eliot and others, as to Samuel Sanford, whether the one or the other, or both, could be deemed for any purpose the assured.

4. The result of the above inquiry leads to the conclusion that it was immaterial whether the plaintiff, Samuel Sanford, was the assured, within the terms of the policy or not; because all the alterations done by him, are mere erections of buildings on the premises, and were done before the policy was effected. However large his powers were to make alterations under the lease from Eliot and others, he never exercised them or made any alterations after the policy was made; there was, therefore, no "alteration" made within the prohibition of article 16 of the by-laws, to affect the validity of the contract. Nor did the alleged increase of risk, by the erection of kettles and boilers therein, take effect, so as if done by the assured, to render the policy void under article 19 of the by-laws, until Sanford, the plaintiff, had underlet the premises to Moore, Collins & Co. This underletting was done by a lease for a term of years, with the usual restrictions not to lease, underlet, nor permit any other person or persons to occupy or improve the same, or make or suffer to be made any alteration therein, but with the approbation of the lessor thereto in writing, with

clauses of reëntry in case of non-compliance with their agreement. The question then is, whether, upon a policy made in reference to these articles 16 and 19 of the by-laws, the acts of lessees under such a lease, making alterations or so using the premises as to increase the risk, would have the same effect in avoiding the policy, as if the same acts were done by the assured. They are not acts literally done by the assured, nor by his express authority or assent. Can they legally be held to be so done by implication ? The argument against it is, that the lessor is not responsible for the acts of the lessee, in the use of the demised premises, any more than a grantor for those of his grantee. The lessee holds the premises by a legal title to the possession, and is not under the control of the lessor. Suppose the lessor, by the terms of his lease, prohibits the lessee from making any alteration in the premises, or from occupying them for any purpose, which would increase the risk of fire, and should require the insertion of express covenants to that effect; this would not necessarily prevent them. His ordinary remedy would be by an action to recover damages. But even when he has reserved a right to reënter, considerable time must elapse before he can make that power effectual by legal process, to regain his possession; and meantime, if the assured is bound by the acts of his tenants, according to the argument of the defendants, the policy may be avoided. But it is not necessary for the decision of this case, to lay down the broader and more general principle, that in no case of a tenancy for years or at will, can the acts of the lessees be taken to be the acts of the lessors; as when, for instance, changes and alteration have been authorized or permitted to be made by parol agreement or license of the lessor to the lessee, either at the time of the letting or afterwards, or by a demise with such general powers as tacitly to permit them.

In the present case, the alterations and changes in the premises alleged to have been made by Moore, Collins & Co., were not made by the consent of the lessor, the present plaintiff but on the contrary, against his express dissent and prohibition expressed in the lease, and against their own express covenants. The lessor used all the means in his power, by the

terms of his lease, to prevent such changes. If made as alleged, they were made in a manner apparently secret and not open and notorious, so that the lessor could not have taken measures to prevent them.

Under these circumstances, the court are of opinion that there has been no such alteration in the condition, or change in the occupation of the buildings insured by this policy as to avoid the contract; and that by the terms on which the case was reserved, the plaintiff is entitled to judgment as on a default.  *Judgment for the plaintiff.*